# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MONTANA

| | |
|---|---|
| In re:<br><br>SHOOT THE MOON, LLC,<br><br>                Debtor. | Case No. 2:15-bk-60979-WLH11 |
| JEREMIAH FOSTER,<br><br>                Plaintiff,<br>   v.<br><br>FIRST INTERSTATE BANK;<br>AMERICAN BANK CENTER; JOHN<br>DOES 1-10,<br><br>                Defendants. | Adv. Proc. No. 2:21-ap-02005-WLH<br><br>**MEMORANDUM OPINION** |

      Chapter 11 bankruptcy cases often move quickly. This need for speed derives from some debtors being the proverbial "melting ice cube" (though fewer than are framed that way by bankruptcy lawyers) and more generally from the reality that delay rarely increases stakeholder recoveries. Expedition has some downsides, however; case participants and bankruptcy judges commonly make case-determinative decisions in the context of imperfect information and uncertainty. With the benefit of hindsight, some decisions prove regrettable.

      In this adversary proceeding, the bankruptcy trustee sued two of the debtor's secured lenders for various alleged wrongdoing despite having agreed to a broad release of those lenders during the underlying chapter 11 case. The lenders move to dismiss on various grounds, including that the release bars the claims and that the complaint contains no allegations potentially invalidating the release. For the reasons set forth below, the court agrees with the lenders.

## BACKGROUND & PROCEDURAL POSTURE

### *The Shoot the Moon Enterprise and Bankruptcy Case Generally*

In the early 2000s, Kenneth Hatzenbeller and two other principal investors created a business generally known as Shoot the Moon. Over time this enterprise grew to consist of nineteen LLCs formed pursuant to Idaho, Montana, and Washington law that, among other things, owned and operated restaurants located throughout the three states. Mr. Hatzenbeller and the Shoot the Moon entities had debtor-creditor relationships with a variety of counterparties, including defendants First Interstate Bank ("FIB") and Prairie Mountain Bank n/k/a American Bank Center ("ABC").

On October 20, 2015, all nineteen Shoot the Moon entities merged into Shoot the Moon, LLC. The following day, this entity filed the underlying chapter 11 bankruptcy petition here.

During the bankruptcy case, Jeremiah J. Foster (the "Trustee") was appointed as the chapter 11 trustee and then as trustee of the STM Liquidating Trust pursuant to the confirmed chapter 11 plan.

### *The Asset Sale and Associated Settlements*

In July 2016 the Trustee moved to sell substantially all property of the bankruptcy estate free and clear of liens, claims, rights, encumbrances, and other interests.[1] Because the proposed purchase price totaled less than the aggregate value of all liens on the property, the Trustee sought the consent of various secured creditors – including defendants – to the sale.[2] The creditors provisionally agreed to the Trustee's proposal "and to provide certain related accommodations

---

[1] *See* Stipulation [etc.], ECF No. 29-1 at pp. 51-52 of 149. Pursuant to FIB's request and Federal Rule of Evidence 201, the court takes judicial notice of all referenced filings and events in the underlying bankruptcy case; with respect to the September 15, 2016 sale hearing transcript, such notice is limited to the fact that certain things were argued to the bankruptcy court, not for the truth of the matters counsel asserted. *See, e.g.*, *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1008 n.2 (9th Cir. 2014) (observing that materials "filed with the bankruptcy court and . . . a publicly available record" are "properly subject to judicial notice and thus may be considered on a Rule 12(b)(6) motion to dismiss" (citation omitted)); *Can v. Goodrich Pump & Engine Control Sys., Inc.*, 711 F. Supp. 2d 241, 250 n.12 (D. Conn. 2010) ("In the context of defendants' motions to dismiss under Rule 12(b)(6), the Court may judicially notice the transcript of the hearing in [a different proceeding], not for the truth of any matters asserted therein, but rather for the fact that certain things were said, argued, and decided in that court.").

[2] *See* Stipulation [etc.], ECF No. 29-1 at p. 52 of 149. *See also generally* 11 U.S.C. § 363(f)(2)-(3).

requested by Trustee . . ., but only under the terms and conditions stated in" a stipulation submitted for the bankruptcy court's approval.³ Absent approval, the stipulation provides that the creditors "have not consented to any sale, and fully reserves [sic] all of their rights to object to any proposed sale."⁴

One key feature of the stipulation is a broad, mutual release of claims. As it relates to the Trustee's side of the bargain, the release provision states that:

> Trustee, on behalf of the Estate, hereby ***fully, finally, absolutely, and forever releases*** and discharges Creditors . . . and their present and former directors, shareholders, officers, employees, agents, representatives, attorneys, consultants, fiduciaries, predecessors, successors, assigns, and affiliates, related corporate divisions, and their separate and respective heirs, personal representatives, attorneys, successors, assigns, and affiliates (collectively, "<u>Released Parties</u>") ***from any and all actions*** (including, without limitation, avoidance actions under Chapter 5 of the Bankruptcy Code), causes of action, claims, debts, damages, demands, liabilities, obligations, suits, judgments, executions, and expenses and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever ***of any and every character, now known or unknown, direct and/or indirect, contingent or matured, of whatever kind or nature***, for or because of any matter or things done, omitted or permitted to be done by any of the Released Parties, at law or in equity ***arising from events occurring prior to and including the date that Approval Order(s) is entered***.⁵

Among other entities, the stipulation includes defendants in the definition of "Creditors."⁶ It also includes an integration clause providing that the stipulation "constitutes the full and entire understanding and agreement between the parties with regard to the subject matter addressed herein and supersedes all prior written or oral agreements, understandings, representations and warranties made with respect thereto."⁷ The stipulation further makes clear that it binds the bankruptcy

---

³ *See* Stipulation [etc.], ECF No. 29-1 at p. 54 of 149.

⁴ *Id.*

⁵ *Id.* ¶ 7, ECF No. 29-1 at p. 66 of 149 (emphasis added).

⁶ *See id.*, ECF No. 29-1 at pp. 51-52 of 149.

⁷ *Id.* ¶ 9, ECF No. 29-1 at p. 68 of 149.

**MEMORANDUM OPINION** Page 3

estate and "any successor trustee or other fiduciary hereafter appointed in the Bankruptcy Case as a representative of the Debtor or its Estate,"[8] which includes the Trustee in his present capacity as liquidating trustee under the chapter 11 plan.

The official committee of unsecured creditors objected to the stipulation, specifically including its concerns about the "general release on behalf of the Estate."[9] The committee's counsel pressed these concerns at a hearing, asserting that the committee believes "there are some substantial claims against the parties being released" and that unsecured creditors are treated unfairly in the distributional waterfall.[10] The bankruptcy court eventually took a recess to allow the parties to discuss a possible resolution.[11] The parties' rapid negotiations proved successful and they reached a further agreement – later documented in a separate stipulation[12] – whereby the secured creditors provided additional concessions regarding distributions of value and the creditors' committee withdrew its objection to the overall transaction, including the proposed general release.[13] The Trustee's counsel explained to the bankruptcy court that the combined transaction aligned the interests of various stakeholders, "made everyone happy except the U.S. Trustee's Office," and was a "good deal" generally beneficial for the bankruptcy estate, in the process noting that "[n]o one's questioning the releases, which are a condition of the secured lenders to do this transaction," and that "in return for that big concession [by the secured creditors], we are giving them a general release of claims that would otherwise be filed against them."[14]

The bankruptcy court ultimately entered an order approving the asset sale and related stipulations, which order expressly states that "[t]he Secured Creditors' Stipulation and all of the terms and conditions thereof are hereby approved, with such terms and conditions incorporated into this Order by this reference."[15] The Trustee does not challenge this order and cannot as it is a final, unappealable order.

---

[8] *Id.* ¶ 12, ECF No. 29-1 at p. 69 of 149.

[9] *See* Obj. to Stipulation [Docket No. 808] ¶¶ 8-10, ECF No. 29-1 at pp. 74-75 of 149.

[10] *See* Sept. 15, 2016 H'rg Tr. 20:3-22, ECF No. 29-1 at p. 11 of 149.

[11] *See id.* 42:15 – 43:13, ECF No. 29-1 at p. 17 of 149.

[12] *See* Stipulation Resolving Objs. [etc.], ECF No. 29-1 at pp. 77-87 of 149.

[13] *See* Sept. 15, 2016 H'rg Tr. 44:3 – 45:15, ECF No. 29-1 at pp. 17-18 of 149.

[14] *See id.* 50:24 – 55:8, ECF No. 29-1 at pp. 19-20 of 149.

[15] *See* Order Authorizing and Approving [etc.] ¶ 4, ECF No. 29-1 at p. 114 of 149.

## Posture of This Adversary Proceeding

The Trustee commenced this adversary proceeding in August 2021, just short of five years after the sale hearing discussed above. The operative complaint alleges that Mr. Hatzenbeller for several years engaged in a check-kiting scheme using the Shoot the Moon entities, that defendants knew of and participated in the scheme, and that the Shoot the Moon entities suffered injury as a result.[16]

The complaint acknowledges the prior stipulation and release, but seeks as its Count I a declaratory judgment that the release is null and void because the Trustee's consent to release defendants from the claims at issue here "was obtained through fraud."[17] To support the alleged fraud, the complaint repeatedly asserts that defendants did not disclose their knowledge and alleged participation in the check-kiting scheme to the Trustee when negotiating the settlement.[18] The complaint goes a step further by generally stating that the lenders "concealed their respective involvement and assistance in facilitating the check-kiting scheme," but offers no details about specific acts of concealment beyond generalized nondisclosure.[19]

Defendants separately move to dismiss the complaint on numerous grounds, including that the release bars the asserted claims.[20] The court has received the benefit of comprehensive briefing and oral argument regarding the dismissal motions and the matter is now ready for decision.

## GENERAL PRINCIPLES

### Jurisdiction & Power

The court has subject matter jurisdiction regarding this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) & 157(a) and Standing Order No. DLC-43 (D. Mont. Jan. 16, 2019). This court is a proper venue for this litigation as a result of

---

[16] *See* Second Am. Compl. ¶¶ 24-59, ECF No. 15.

[17] *See id.* ¶¶ 76-81.

[18] *See id.* ¶¶ 47, 60, 63.

[19] *See id.* ¶ 80.

[20] Because the court ultimately agrees with the lenders that the release bars the Trustee's claims as asserted in the Second Amended Complaint, the court does not address the various other theories and arguments raised in support of dismissal. *See, e.g.*, *Turner v. United States Parole Comm'n*, 810 F.2d 612, 613 n.3 (7th Cir. 1987) (highlighting federal courts' "general duty to avoid deciding unnecessary issues").

the pendency of the underlying Shoot the Moon bankruptcy case in this district.[21] The Trustee's complaint states that "the Trustee consents to entry of a final order or judgment by this Court."[22] Accordingly, the court may properly exercise the judicial power necessary to decide the pending dismissal motions.[23]

*Rule 12(b)(6) Standards*

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss based on the "failure to state a claim upon which relief can be granted."[24] To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[25]

When assessing the facial plausibility of alleged facts courts generally treat the allegations as true and construe them in the plaintiff's favor, but this principle "is inapplicable to legal conclusions" or bare "recitals of the elements of a cause of action, supported by mere conclusory statements."[26] The plausibility analysis likewise is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[27] The plausibility analysis thereby tests the initial legal sufficiency of the plaintiff's claims, making dismissal appropriate when "there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory."[28]

Dismissal under Rule 12(b)(6) can be appropriate when the asserted claims are barred by a release or other provision in a prior settlement agreement between litigants.[29]

---

[21] *See* 28 U.S.C. § 1409(a).

[22] Second Am. Compl. ¶ 3, ECF No. 15.

[23] *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 674-81 (2015). In light of the Trustee's express consent, the court need not decide whether this litigation is a "core" bankruptcy proceeding. Denial of the dismissal motions would not be a final order or judgment and hence would not require anyone's consent.

[24] Fed. R. Civ. P. 12(b)(6). This rule applies here via Federal Rule of Bankruptcy Procedure 7012(b).

[25] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[26] *Id.*

[27] *Id.* at 679.

[28] *See, e.g.*, *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

[29] *See, e.g.*, *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1008 (9th Cir. 2012).

*Settlements and Releases Generally*

Settlement is encouraged in federal court.[30] This policy stems from the benefits accompanying settlement, including certainty of outcomes; resolution of, and the ability to move past, stressful or time-consuming disputes; elimination of costs, risks, and delay; maximizing value and avoiding zero-sum outcomes; and conservation of resources for parties and the judiciary. In many instances, settlement is a net benefit for everyone (other than perhaps the professionals).[31]

Settlement is particularly valuable in bankruptcy. Approximately 147 years ago, the Supreme Court emphasized the utility of "speedy sales, reasonable compromises, and efforts to adjust differences" as tools to promptly administer bankruptcy estates.[32] The Court has reiterated this same point many times over the decades.[33] Bankruptcy Rule 9019(a) – which lacks analog in the general civil rules – further cements the foundation by providing that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."[34] The flexibility inherent in Rule 9019(a) and its statutory counterpart section 363(b)[35] has facilitated significant creativity in the negotiation and crafting of complex, multiparty settlements resolving what might otherwise be intractable

---

[30] *See, e.g.*, *Stone v. City & County of San Francisco*, 968 F.2d 850, 861 n.20 (9th Cir. 1992) (quoting authority regarding "[t]he strong policy encouraging settlement of cases"); *Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1225 (9th Cir. 1989) ("In general, the policy of federal courts is to promote settlement before trial."); *Russian Std. Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 384 (S.D.N.Y. 2007) ("The federal courts have a well-established policy of encouraging settlement to promote judicial economy and limit the waste of judicial resources."). *See also generally* Fed. R. Civ. P. 68; Fed. R. Evid. 408. Montana courts recognize the same policy. *See, e.g.*, *Miller v. State Farm Mut. Auto. Ins.*, 337 Mont. 67, 71-72 (2007) ("The declared public policy of this State is to encourage settlement and avoid unnecessary litigation.").

[31] *See, e.g.*, *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 530 (E.D. Tex. 1995) ("If the Global Settlement is not ultimately approved, the only winner will be the asbestos litigation industry – lawyers on both sides, doctors, consultants, other expert witnesses, etc. – which has historically consumed as much as 63 cents of each asbestos litigation dollar.").

[32] *See Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 347 (1875).

[33] *See, e.g.*, *Gardner v. New Jersey*, 329 U.S. 565, 581 (1947) (Douglas, J.) (observing that "one useful and fitting function of a reorganization court was the compromise or settlement of claims, so that interminable litigation might be ended and the interests of expedition in promulgating a plan of reorganization served"); *Grp. of Inst. Invs. v. Chicago, M., St. P. & P. R. Co.*, 318 U.S. 523, 565 (1943) (Douglas, J.) ("[C]ompromises, settlements, and concessions are a normal part of the reorganization process."); *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939) (Douglas, J.) ("There frequently will be situations involving conflicting claims to specific assets which may, in the discretion of the court, be more wisely settled by compromise rather than by litigation. . . . In sanctioning such settlements the court is not bowing to nuisance claims; it is administering the proceedings in an economical and practical manner.").

[34] Fed. R. Bankr. P. 9019(a).

[35] *See, e.g.*, *In re Claar Cellars LLC*, 2020 Bankr. LEXIS 682, at *10-12 (Bankr. E.D. Wash. Mar. 13, 2020).

disputes in nonbankruptcy contexts.[36]  This process has preserved or created value for hundreds of thousands of bankruptcy estates.

A key and common component of many such settlements is a claim release like the one the parties forged here.  These releases further the goals of finality and certainty by providing a mechanism to achieve "global peace" among competing parties.[37]  Releases of estate claims thus appear in various bankruptcy contexts, including DIP financing or cash collateral orders,[38] standalone settlement agreements or multipart transactions,[39] and chapter 11 plans.[40]

Quick negotiation is another common feature of settlements and other transactions in bankruptcy due to business or other exigencies.  As Chief Justice Roberts concisely wrote, "expedition is always an important consideration in bankruptcy."[41]  Indeed, bankruptcy practice is notorious for compromises reached "on the courthouse steps" or "in the hallway" during a hearing recess, which are often taken to facilitate the process.  This occurred here when only during a recess did the creditors' committee agree to the Trustee's proposed transactions, including the release, after the secured creditors provided additional concessions.

Given the speed associated with bankruptcy transactions and the crucible of uncertainty in which case-defining agreements are often struck, an occasional but inevitable result will be terms that someone regrets in hindsight.  Nevertheless, because of the demanding standards required for such relief and the need to let parties form settled expectations around final orders, courts rarely allow post hoc recutting of an original, bankruptcy-court-approved deal.[42]

---

[36] *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, 2017 Bankr. LEXIS 1872 (Bankr. S.D.N.Y. July 6, 2017); *In re Residential Cap., LLC*, 497 B.R. 720 (Bankr. S.D.N.Y. 2013).

[37] *See, e.g.*, *In re Boyer*, 354 B.R. 14, 29 (Bankr. D. Conn. 2006), *aff'd*, 372 B.R. 102 (D. Conn. 2007), *aff'd*, 328 F. App'x 711 (2d Cir. 2009).

[38] *See, e.g.*, *In re AOG Entm't, Inc.*, 558 B.R. 98, 103-04 (Bankr. S.D.N.Y. 2016) (describing stipulations contained in financing orders, which were subject to a "challenge" period before becoming operative).

[39] *See, e.g.*, *In re CPJFK, LLC*, 496 B.R. 290, 295-96 (Bankr. E.D.N.Y. 2011).

[40] *See, e.g.*, *In re Astria Health*, 623 B.R. 793, 800-02 (Bankr. E.D. Wash. 2021).

[41] *Bullard v. Blue Hills Bank*, 575 U.S. 496, 505 (2015).

[42] *See, e.g.*, *Kravitz v. Samson Energy Co. (In re Samson Res. Corp.)*, 590 B.R. 643 (Bankr. D. Del. 2018) (enforcing release provisions contained in confirmed chapter 11 plan despite a bankruptcy trustee's arguments that "it is simply inconceivable that the Plan would operate to release some or all of these defendants"); *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143 (Bankr. S.D.N.Y. 2011) (denying Rule 60(b) motions regarding the details of "the largest, most expedited and probably the most dramatic asset sale that has ever occurred in bankruptcy history"), *aff'd in part and rev'd in part on other grounds*, 478 B.R. 570 (S.D.N.Y. 2012), *aff'd*, 761 F.3d 303 (2d Cir. 2014).

# ANALYSIS OF THE COMPLAINT & MOTIONS TO DISMISS

## *The Trustee Fails to Plead Grounds to Invalidate the Release*

The parties generally agree that Montana contract law should be used to determine the scope and validity of the release.[43] The plain language of the release encompasses the claims against defendants by sweeping in all "claims . . ., now known or unknown, . . . of whatever kind or nature . . . arising from events occurring prior to and including the date that Approval Order(s) is entered."[44] The Trustee offers no contrary interpretation of this expansive language but argues that he should be freed from the terms based on defendants' failure to disclose information related to potential claims against them during negotiation of the release.[45] The real question for present purposes, then, is whether the Trustee alleges facts providing a facially plausible basis on which the court could invalidate the release.

According to the Trustee, defendants' failure to disclose the information at issue amounts to fraud thereby rendering the release invalid.[46] This theory, as alleged in the complaint and amplified in the Trustee's briefing, rests on the premises that defendants failed to disclose information specifically about the alleged check kiting when negotiating the release and that the Trustee would not have agreed to a general release otherwise.

---

[43] *See, e.g.*, *Rich v. Ellingson*, 340 Mont. 285, 290-91 (2007). As ABC notes, the analysis is potentially complicated by the fact that the release was approved by, and expressly incorporated into, a final order of the bankruptcy court, which final order the Trustee has not sought to modify or invalidate. Because the Trustee has not alleged facts that would vitiate the release in the first instance, the court need not and does not reach this additional wrinkle. *Cf.* the authorities cited in note 42.

[44] *See* Stipulation [etc.] ¶ 7, ECF No. 29-1 at p. 66 of 149.

[45] Although the point may be obvious with hindsight, there are many ways in which the release language could have been drafted to preserve the claims the Trustee now asserts. For example, (i) the release could have been limited to "known" claims or to claims specified on a schedule; (ii) the release could have included some exclusions or carveouts, perhaps regarding claims for "willful misconduct or fraud" (a common exclusion from exculpation and release provisions in chapter 11 plans), or otherwise defined a universe of retained or reserved claims; or (iii) the stipulation could have specified a further investigation period regarding all "unknown" claims before any release of those claims became operative. The language actually negotiated by the parties and approved by the bankruptcy court, however, sweeps broadly and without limits.

[46] The Trustee's briefing is clear that the Trustee is relying on a fraud theory, not other theories that some litigants assert when attempting to attack a contract. *See, e.g.*, Trustee's Resp. in Opp'n [etc.], ECF No. 55 at p. 26 (explaining that the "Trustee is seeking to set aside the release contained within the Settlement Agreement based on fraud—not mutual mistake").

The allegations do not rise to a level sufficient to support a fraud claim or to invalidate the release.  The thrust of the Trustee's theory, formed from allegations that defendants did not unilaterally *volunteer* information, lacks a legal basis.  Montana case law demonstrates that more affirmative conduct than simple nondisclosure is needed to establish fraudulent concealment.[47]  This concept is not unique to Montana but is part of the general law of contracts.[48]  The distinction between action and inaction is also important in other regions of the law.[49]

This tenet reveals the fatal defect of the operative complaint: it does not allege affirmative acts by either FIB or ABC to mislead, hinder, or otherwise create any misimpressions.  It contains no allegations that the Trustee made inquiries or that defendants provided false responses.  It also contains no allegations that defendants concealed information or hindered the Trustee's ability to learn of relevant facts elsewhere.  Nor does it contain allegations that anyone acting on behalf of defendants made any oral representations or warranties relating to the possible effect of the broad release or to Shoot the Moon or Mr. Hatzenbeller

---

[47] *See, e.g.*, *Wolfe v. Flathead Elec. Coop., Inc.*, 393 Mont. 312, 316 (2018) ("Fraudulent concealment requires the employment of artifice, planned to prevent inquiry or escape investigation, and to mislead or hinder information acquisition." (cleaned up)); *Holman v. Hansen*, 237 Mont. 198, 202 (1989) ("We have previously held that in the context of non-malpractice negligence actions, invoking fraudulent concealment requires a showing of affirmative conduct by the defendant calculated to obscure the existence of the cause of action."); *Kerrigan v. O'Meara*, 71 Mont. 1, 7 (1924) (reciting the general principle that "there must be some active affirmative concealment of the fraud, something said or done to continue the deception or to prevent inquiry and lull plaintiff into a sense of security").  This concept is embedded in the Montana statute the Trustee cites as the basis for his claim of actual fraud: "The statutory definition of actual fraud . . . includes a party's 'suppression of that which is true.'"  *See* Trustee's Resp. in Opp'n, ECF No. 55 at p. 17 (citing Mont. Code Ann. § 28-2-405(3)).  Suppression requires one "[t]o put a stop to, put down, or prohibit; to prevent (something) from being seen, heard, known, or discussed."  *Suppress*, BLACK'S LAW DICTIONARY (11th ed. 2019).  This notion stems from the first principle that the lack of any act at all does not satisfy the intent element of fraud absent a specific obligation to act.  Once again, the concept is expressed in the statute on which the Trustee relies.  *See* Mont. Code Ann. § 28-2-405 ("Actual fraud . . . consists [of a] party's connivance *with intent* to deceive another party to the contract or to induce the other party to enter into the contract[.]" (emphasis added)).

[48] *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 161 cmt. a (Am. Law Inst. 1981) ("Non-disclosure without concealment is equivalent to a misrepresentation only in special situations.  A party making a contract is not expected to tell all that he knows to the other party, even if he knows that the other party lacks knowledge on some aspects of the transaction.  His nondisclosure, as such, has no legal effect except in the situations enumerated in this Section."); 26 WILLISTON ON CONTRACTS § 69:16 (4th ed. rev. 2021) (explaining that "it is not necessarily fraudulent for one party to a bargain consciously to take advantage of the ignorance or mistake of the other party by failing to disclose material facts, provided no words or acts of the party who failed to disclose the fact in question contribute to the mistake, and there is no duty existing between the parties that compels disclosure of the facts" (footnotes omitted)).

[49] *See, e.g.*, *City of Chicago v. Fulton*, 141 S. Ct. 585, 589 (2021) (holding "that mere retention of property does not violate" the automatic stay in Bankruptcy Code section 362(a)(3)).

generally.[50]  Instead, the alleged facts simply tell a story of passive nondisclosure – a failure to volunteer – which is legally insufficient to invalidate the release.

The complaint does include a statement that defendants "concealed their respective involvement and assistance in facilitating the check-kiting scheme."[51] This bare statement is insufficient to state a fraud claim plausible on its face for multiple reasons.  ***First***, the statement does not constitute a factual allegation entitled to a construction in plaintiff's favor but is simply a conclusory recital of an element that might support a fraud theory.[52]  Further, the complaint contains no factual details regarding specific acts of concealment but rests on the allegations of generalized nondisclosure.  ***Second***, the purported concealment conflicts with other information the Trustee presents as evidence of his theory.  Specifically, the Trustee asks the court to take notice of an interaction at a Rule 2004 exam where FIB's counsel asked a Shoot the Moon principal a question regarding check kiting.[53]  As the Trustee points out, this Rule 2004 examination occurred several months before the parties executed their stipulation.  Further, numerous attorneys attended representing parties potentially adverse to FIB and certainly opposed to concealment of any misconduct, including an assistant United States trustee.[54]  It belies common sense and the court's judicial experience that a party hoping to ***conceal*** information would raise the topic on the record in an adversarial and open forum.  Thus, to the extent relevant at this juncture, the back-and-forth at the Rule 2004 examination only undermines the conclusory statement about concealment.

Apparently recognizing the general inadequacy of defendants' alleged inaction, the Trustee argues that the complaint establishes "special circumstances" creating a duty of disclosure due to defendants' "peculiar knowledge" of material

---

[50]  Given the integration clause in paragraph 9 of the parties' stipulation, it is unclear whether any oral representations or warranties would be relevant.  Because there is no allegation that any such oral statements were made, however, the court need not and does not reach this issue.

[51]  Second Am. Compl. ¶ 80, ECF No. 15.

[52]  *See Iqbal*, 556 U.S. at 678.

[53]  *See* Trustee's Req. for Judicial Notice, ECF No. 58.  ABC opposes this request and seeks to add thirty-one additional pages of testimony from the Rule 2004 exam for context.  *See* ABC's Obj. to Trustee's Req. for Judicial Notice, ECF No. 59.  The court does not believe the additional context is necessary based on the Trustee's stated desire for the court merely to take notice of the fact that the question was asked as part of a formal, transcribed proceeding arising from another bankruptcy case.  The court concludes that it is appropriate to take judicial notice of the discrete question for this limited purpose.

[54]  *See* Trustee's Req. for Judicial Notice, ECF No. 58-1 Ex. A at pp. 4-5 of 6.  The Trustee apparently was not represented at this examination even though testimony was sought regarding the affairs of Shoot the Moon.  There has been no allegation that the Trustee was barred from participating or that FIB or anyone else did something to hide the transcript from the Trustee.

facts about the check-kiting scheme.[55] The Trustee cites no authority indicating that this duty arises in the context of adverse parties negotiating a settlement agreement or release.[56] This absence of authority is unsurprising because such a duty leads to absurd and untenable results. A party to pending or potential litigation almost always has "peculiar knowledge" of the strengths and weaknesses of its position (some of which may be privileged). The adverse party can seek to obtain some of that information either informally or through discovery, but there is no requirement that information not sought by the adverse party be unilaterally volunteered as part of the process.[57]

Indeed, a requirement that potentially harmful information be affirmatively disclosed as a condition to an effective settlement or release would hamper and discourage settlement negotiations contrary to public policy.[58] Such a requirement would also create boundless uncertainty subjecting any general release to attack months or years down the road, which again discourages settlement and disrupts the reasonable expectations of parties protected by general releases or, as here, an express release of any "unknown" claims.[59] This is especially true since categorization of facts as relevant, harmful, innocuous, or material is often a matter of legal opinion about which reasonable attorneys could disagree.[60] Finally,

---

[55] *See, e.g.*, Trustee's Resp. in Opp'n [etc.], ECF No. 55 at p. 22.

[56] The cases cited by the Trustee arose in inapposite and distinguishable contexts, such as disputes about the sale of contaminated real property. *See, e.g.*, *Mattingly v. First Bank*, 285 Mont. 209 (1997). In addition, even those cases describe more intentional, active conduct than passive nondisclosure. *See, e.g., id.* at 219 ("This Court has held special circumstances may exist where one party has ***acted to mislead*** the other in some way. Specifically, this Court has determined that constructive fraud may be present where sellers of real property, ***by words or conduct, create*** a false impression concerning serious impairment or other important matters and subsequently fail to disclose the relevant facts." (cleaned up; emphasis added)).

[57] *See, e.g.*, *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1039 (9th Cir. 2011) ("When adversaries in a roughly equivalent bargaining position and with ready access to counsel sign an agreement to establish a general peace, we enforce the clear terms of the agreement. Parties involved in litigation know that they are locked in combat with an adversary and thus have every reason to be skeptical of each other's claims and representations. They can use discovery to ferret out a great deal of information before even commencing settlement negotiations." (cleaned up)).

[58] *See, e.g., id.* ("There are also very important policies that favor giving effect to agreements that put an end to the expensive and disruptive process of litigation."); note 30 *supra*.

[59] *See, e.g.*, *Facebook, Inc.*, 640 F.3d at 1040 ("An agreement meant to end a dispute between sophisticated parties cannot reasonably be interpreted as leaving open the door to litigation about the settlement negotiation process. A release in such an agreement would be useless to end litigation if it couldn't include claims arising from the settlement negotiations." (citation omitted)).

[60] For example, in the securities context the determination of materiality is "an inherently fact-specific finding" keyed to "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to" such a shareholder. *See Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988) (cleaned up). Such a multifaceted test (rather than "a rigid formula," *id.*, that might produce more predictable, albeit sometimes over- or underinclusive, results) necessarily carries with it some uncertainty.

settlement negotiations and releases are commonplace and thus cannot categorically provide "special" circumstances implicating what is intended to be a limited exception to the default legal rules.[61] In sum, without on-point Montana authority requiring that settlement counterparties affirmatively volunteer unrequested information to each other, the court concludes that such a duty does not and should not exist.[62]

      In the bankruptcy context, a chapter 11 trustee must "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor."[63] There can be significant consequences if a party stymies a trustee's investigation, such as by lying to the trustee, hiding relevant information, or not responding to valid inquiries. Creditors do not have a duty, however, to simply volunteer unsolicited information to a bankruptcy trustee,[64] including when those creditors are negotiating a release with the trustee. If a trustee needs additional information before agreeing to a complete release, then he or she can request the information or the release language can be crafted to accommodate uncertainty.[65] As alleged in the current complaint, the Trustee negotiated, agreed to, and convinced the bankruptcy court to approve an extremely broad, general release of all known and unknown claims without any misdirection by defendants. The complaint does not allege a facially plausible basis on which to invalidate this release.[66] As such, dismissal is appropriate under Rule 12(b)(6).

---

[61] *Cf. In re Astria Health*, 623 B.R. at 801 n.25 (describing "the Lake Wobegon effect whereby many ordinary and average things are postured as extraordinary, causing the very concept of extraordinariness to lose meaning").

[62] Defendants argue that even if there is a general duty to volunteer information to the Trustee, that duty would not apply to them because of obligations imposed by regulations authorized under the Bank Secrecy Act mandating nondisclosure of "Suspicious Activity Reports" or certain information underlying or pertaining to such regulatory reports. Because the court concludes that the predicate general duty does not exist, the court need not and does not reach this issue.

[63] 11 U.S.C. § 1106(a)(3).

[64] *See, e.g.*, *Miller v. Greenwich Cap. Fin. Prods. (In re Am. Bus. Fin. Servs.)*, 471 B.R. 354, 365 (Bankr. D. Del. 2012).

[65] *See, e.g.*, *Facebook, Inc.*, 640 F.3d at 1039 (explaining how settling parties "can further protect themselves by requiring that the adverse party supply the needed information, or provide specific representations and warranties as a condition of signing the settlement agreement").

[66] Because the Trustee does not assert a count for breach of the trust agreement whereby defendants formerly served as members of the post-confirmation trust oversight committee, the court does not resolve the parties' apparent disagreements about the terms of that document (doing so would require more fulsome briefing and perhaps a different record). Nevertheless, it is doubtful that the task to "generally oversee, review and guide the Trustee on the performance of the Trustee's duties and activities" creates a disclosure duty for the committee members; this language seems more naturally read to contemplate a general supervisory role rather than an active, participatory role. In any event, even assuming for the sake of argument that the trust agreement creates some disclosure duty, the temporal sequence of events would not permit a breach of that duty to invalidate a release that was operative more than a year earlier and that precludes all counts in the current complaint.

*Leave to Amend*

The Trustee requests leave to file an amended complaint if the court grants defendants' Rule 12(b)(6) motions. Leave to amend a deficient complaint is freely granted unless amendment would be futile.[67] The court cannot conclude at this juncture that *any* amendment would necessarily be futile. Thus, leave to amend is appropriate and the court grants the request. The Trustee should not replead claims without curing (to the extent possible consistent with Bankruptcy Rule 9011(b)) the deficiencies addressed above; any amendment must include particularized factual allegations regarding defendants' affirmative conduct relating to the parties' stipulation. The Trustee must file his amended complaint **no later than February 28, 2022,** if he decides to amend. If the Trustee does not file an amended complaint or seek additional time to do so within the time provided, then, on or after March 1, 2022, defendants may submit for the court's signature an order dismissing this adversary proceeding with prejudice.

## SUMMATION

For the reasons detailed above, defendants have established that the Trustee's complaint fails to state a claim upon which relief can be granted. As such, the court will grant the motions to dismiss the complaint with leave for the Trustee to amend. The court will enter a separate order consistent with this written decision.

DATED: January 18, 2022.

WHITMAN L. HOLT
U.S. BANKRUPTCY JUDGE

---

[67] *See Gordon v. City of Oakland*, 627 F.3d 1092, 1094 (9th Cir. 2010); *Manzarek v. St. Paul Fire & Marine Ins.*, 519 F.3d 1025, 1031 (9th Cir. 2008).